UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

                                                    **ECF CASE**

CASANOVA ENTERTAINMENT GROUP, INC.,          :
                                                    05 Civ. 2721 (WCC)
                        Plaintiff,           :

        - against -                          :      **OPINION**
                                                    **AND ORDER**
CITY OF NEW ROCHELLE,                        :

                        Defendant.           :

- - - - - - - - - - - - - - - - - - - X


**A P P E A R A N C E S :**

                                            BERKMAN, GORDON, MURRAY & DeVAN
                                            55 Public Square, Suite 2121
                                            Cleveland, OH 44113

J. MICHAEL MURRAY, ESQ.
STEVEN D. SHAFRON, ESQ.

        Of Counsel
                                                    - and -


                                            MEHLER & BUSCEMI
                                            305 Broadway
                                            New York, NY 10007

MARTIN P. MEHLER, ESQ.

        Of Counsel                          **Attorneys for Plaintiff**


                                            ZARIN & STEINMETZ
                                            81 Main Street, Suite 415
                                            White Plains, NY 10601

DAVID S. STEINMETZ, ESQ.
SUSAN H. SARCH, ESQ.
JODY T. CROSS, ESQ.
                                                    - and -
        Of Counsel

**A P P E A R A N C E S :** **(continued)**

CORPORATION COUNSEL FOR THE CITY
  OF NEW ROCHELLE
515 North Avenue
New Rochelle, NY 10801

BERNIS E. SHAPIRO, ESQ.

    Of Counsel           **Attorneys for Defendant**

**CONNER, Senior D.J.:**

Plaintiff Casanova Entertainment Group, Inc. ("Casanova") commenced the present action against defendant City of New Rochelle ("New Rochelle" or the "City") seeking: (1) a declaration that certain sections of New Rochelle's codified zoning ordinances relating to adult-oriented establishments[1] are unconstitutional on their face and as applied under the First and Fourteenth Amendments; and (2) a preliminary injunction and, after final hearing, a permanent injunction, prohibiting defendant from enforcing against plaintiff sections of the Code relating to adult entertainment establishments in deprivation of plaintiff's rights secured by the First and Fourteenth Amendments of the United States Constitution.[2]   This action is presently before the Court on Casanova's motion for a preliminary injunction requesting that the Court enjoin defendant from enforcing the Code against plaintiff who plans to present adult entertainment, as defined by the Code, at 50 LeCount Place, an improved parcel of real estate in New Rochelle located in an area of the City zoned Downtown Business in which plaintiff is currently operating a cabaret.  In addition, defendant contemporaneously moves to dismiss the action in its entirety.

Under New Rochelle's current zoning laws, plaintiff cannot legally operate an adult entertainment business at 50 LeCount Place.  Plaintiff alleges that the Code limits the location of adult entertainment establishments to the extent that there are, in effect, no available sites on which

---

[1] In particular, plaintiff is seeking relief with respect to Sections 331-87, 331-89, 331-90 and 331-112 of New Rochelle's zoning code which regulate the establishment of adult-oriented businesses.  New Rochelle's zoning ordinances will be referred to herein as the "Code."

[2] Plaintiff also requests a declaration that the Code sections are unconstitutional on their face and as applied under Art. I, §§ 1, 8 and 11 of the New York Constitution and seeks a preliminary and permanent injunction prohibiting defendant from enforcing the relevant Code sections in deprivation of plaintiff's rights secured by Art. I, §§ 1, 8 and 11 of the New York Constitution.

an adult entertainment establishment could legally operate within the borders of New Rochelle, thus denying such establishments a reasonable opportunity to operate in New Rochelle. For the reasons stated hereinafter, plaintiff's motion for a preliminary injunction is denied and defendant's motion to dismiss is denied.

## BACKGROUND

### I. Statement of Facts

The following facts are derived from the Complaint,[3] the evidentiary hearing (the "Hearing")[4] and the parties' respective submissions.

Plaintiff, a corporation organized and existing under the laws of the State of New York, and the lessee of real property in New Rochelle, wants to open an adult entertainment cabaret at 50 LeCount Place, but contends that it cannot do so because of defendant's zoning code. (Complt. ¶¶ 1, 6.) Specifically, plaintiff seeks to operate a business which presents "constitutionally protected, artistic dance performances by women, who in the course of their performances, will appear topless and in g-strings." (*Id.* ¶ 6.)

The City of New Rochelle is a small, densely populated residential "bedroom suburb" of New York City. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 1.) New Rochelle spans approximately

---

[3] All references to the "Complaint" are to plaintiff's Amended Complaint filed March 25, 2005.

[4] The evidentiary hearing was held on May 23, 2005 and May 27, 2005. At the Hearing, plaintiff presented the following witnesses: (i) Robert Bruce McLaughlin, professional planner; (ii) Paul Vacca, Senior Building Construction Inspector for the City; (iii) Kathleen Gill, Deputy Corporation Counsel for the City; and (iv) Steven L. Fernandez, GIS analyst. New Rochelle presented the following witnesses: (i) Vincent Ferrandino, professional planner; (ii) Peter C. Hart, architect; and (iii) Edward Francis Lynch, Senior Planner for the City.

10.67 square miles or 6,820.8 acres with a population of approximately 72,582. (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 4.)[5] For many years, New Rochelle's downtown business area had been deteriorating; however, the City "has taken significant steps to reclaim its downtown and residential, commercial and public space developments." (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 1.) In particular, defendant calls attention to the recently constructed New Roc City, a family entertainment center located across the street from the premises in which plaintiff wants to establish an adult entertainment cabaret. (*Id.*)

New Rochelle's Code creates a number of use districts within the city and sets forth the kinds of uses that are permitted in each such district. (Complt. ¶ 2.) New Rochelle first enacted an adult-oriented zoning provision in 1996 "relying on well-known and accepted empirical studies and evidence showing the blighting effect of such establishments and the need to carefully locate them." (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 1.) However, the City maintains that it has always intended for adult-oriented businesses to be permitted in the LI and I Districts.[6] (*Id.* at 4.) The City contends that there were numerous sites available for adult-oriented businesses when the Code was initially established, but recent events, such as the designation of an historic landmark, made numerous lots unavailable for this type of business. (*Id.*) In response to plaintiff's assertion at the commencement of this action that there were no available sites anywhere in the City that would allow an adult-oriented business to legally operate, New Rochelle proposed amendments to the Code. (*Id.*) The proposed amendments were set for a public hearing and adopted on June 14, 2005.

---

[5] Plaintiff cites http://factfinder.census.gov in asserting that the population estimate in 2003 was 72,582 and *Secondary Effects Analysis of Adult-Oriented Businesses in the City of New Rochelle*, (January 1996), p. 16, in asserting the amount of land.

[6] "LI" and "I" refer to the districts zoned "Light Industrial" and "Industrial" respectively.

(Def. Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 1.)  The amended Code mandates that no adult-oriented business shall be permitted:

> (1) Within 400 feet of another adult-oriented business; (2) Within 400 feet of a zoning district that permits residential dwellings as a principal use; (3) Within 400 feet of the property line of a school, house of worship, public park, public recreation facility, public community center, public library, or designated urban renewal area.

(Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 4-5 (quoting Proposed Amendments to Zoning Code § 331-112(A), annexed as Def. Appendix).)  Additionally, "[a]dult-oriented businesses shall be located on lot(s) which are a minimum of 50 feet from the property line of any lot(s) containing non-conforming residential uses or private recreational facilities."  (*Id*. § 331-112(G)(1).)

The establishment plaintiff desires to operate on its property would be considered an "adult entertainment cabaret" under the Code, which is defined as "'a public or private establishment which presents topless dancers, bottomless dancers, strippers, male or female impersonators or exotic dancers or other similar entertainment, either on a regular or sporadic basis, and which establishment is customarily open to the public generally but excludes any minor by reason of age.'" (Complt. ¶ 8 (quoting Zoning Code § 331-4).)  The Code requires an establishment that plans to open an adult-oriented business to obtain a special permit use which the Board of Zoning Appeals must authorize. (Complt. ¶ 10.)  Section 331-89 of the Code sets forth the requirements that all special permit use applicants must satisfy and provides that a special use permit for an "adult entertainment cabaret" must be renewed annually.  (*Id*. ¶¶ 11, 17.)  Section 331-89, "in addition to authorizing the issuing agency to attach 'such additional conditions and safeguards to any special permit, that are, in its opinion, necessary to insure initial and continual conformance' to the [C]ode, requires an application to satisfy the issuing agency that the 'location and size of the special permit use, the nature and intensity of the operations . . . are such that it will be in harmony with the appropriate and orderly

4

development of the area in which it is located.'" (*Id.* (quoting Zoning Code § 331-89).)  In addition, a special permit use applicant must also convince the issuing agency that the operation of the special permit use will be "no more objectionable to nearby properties by reason of noise, traffic, fumes, vibration or other such characteristics" than would uses permitted as of right.  (Zoning Code § 331-89 (B), (C).)  Furthermore, Section 331-112 of the Code restricts adult cabarets to less than 5,000 square feet; requires that their exterior be "consistent with the character of the surrounding structures" and not "detract from the appearance of the neighborhood"; prohibits nude dancing that is lewd, indecent or grossly sexual in nature; and permits the Planning Board and Sign Review Board to impose terms and conditions for granting site plan approval, including restrictions on window displays, signage and hours of operation for adult-oriented businesses.  (Complt. ¶¶ 14, 15, 16.)

Plaintiff maintains that Sections 331-87, 331-89, 331-90 and 331-112 of the Code are unconstitutional under the First and Fourteenth Amendments for the following reasons:

> (a) The ordinances unconstitutionally abridge freedom of speech and expression and impose an impermissible restraint on constitutionally protected expression; (b) The ordinances confer unbridled discretion on city officials to suppress constitutionally protected expression; (c) The ordinances are irrational, arbitrary and capricious because they do not further a substantial government interest; (d) The ordinances are not narrowly tailored to further any governmental interest; (e) The ordinances were enacted without relevant empirical information to support them; (f) The ordinances fail to provide alternative avenues of communication; [and] (g) The ordinances are unconstitutionally vague and overbroad.

(Complt. ¶ 18.)

As mentioned earlier, an evidentiary hearing was held on May 23, 2005 and May 27, 2005 to determine whether, under the Code, alternative avenues of expression for adult-oriented entertainment exist in New Rochelle.  Thus, we must now determine if there are any sites on which an adult-oriented establishment, such as the type plaintiff desires to operate, would be permitted to

legally operate in New Rochelle.

## II.　　**Potential Available Sites**

Adult-oriented establishments are permitted to locate in the I or LI Districts of New Rochelle and the potentially "available" sites can be found in three zones respectively denominated Areas B, C and D. Plaintiff maintains that there are only three potential lots, found in Area C, on which an adult entertainment establishment could operate, but that the locational restrictions relating to adult-oriented uses imposed by the City's Code, which requires adult-oriented establishments to be 400 feet from one another, would allow only one such establishment to locate in the City. (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. 12-13.) Defendant, however, contends that there are six lots "available" in New Rochelle, located in Areas B, C and D, in which an adult-oriented business could legally operate in compliance with the Code. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 18.) Accordingly, we will now consider which if any of these lots are "available" for use by adult-oriented businesses in compliance with the Code.

### A.　　**Area B**

#### 1.　　**"Bowling Alley" Lot**

The first lot in question, which has been referred to as the "Bowling Alley Lot" based on its elongated shape, is located in Area B between Beechwood and Webster Avenues. (*Id*. at 11.) The parties agree that one corner of the lot is located less than the minimum of 400 feet from an urban renewal district required by the Code, but only by approximately two to four feet. (*Id*. at 12; Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 11.) Thus, plaintiff maintains that because a 400-foot

radius drawn from the nearest point of the urban renewal district intersects a corner of the Bowling Alley Lot, the lot cannot properly be counted as an available site for purposes of evaluating alternative avenues of communication. (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 11.) Defendant, however, maintains that the encroachment does not leave this lot "unavailable" because the spacing requirement specifies that "[n]o adult-oriented business . . . shall be permitted" within 400 feet of an urban renewal area. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 12 n.15 (emphasis in original).) Therefore, defendant contends that "since the business itself can be placed on the lot such that the building is not impacted by the encroachment . . . , the encroachment is irrelevant. There is no requirement in the Code that the lot be 400 feet from an urban renewal district, merely the business." (Id. (emphasis in original).)[7] According to Ferrandino, the City's expert, "the practicality of the Bowling Alley Lot is that "[t]he area of overlap is so minuscule that you can absolutely construct the building, configure parking and probably put landscaping in without necessarily violating the viability of the particular lot.'" (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 12 (quoting May 27 Hr'g Tr. at 132).) In addition, the City maintains that due to the minute encroachment and the inherent margin of error in GIS data, the encroachment is "so de minimis as to be irrelevant" and has offered to stipulate that the Bowling Alley Lot is an available lot for an adult-oriented use. (Id. at 12 n.15, 13 (citing May 27 Hr'g Tr. at 106-07).)

Plaintiff argues that the City cannot cure the unconstitutionality of its ordinance by offering to ignore its "plain and unambiguous terms." One difficulty with that argument is that the ordinance,

---

[7] The City notes that it has never had an opportunity to interpret its ordinance; thus, this interpretation is reasonable. In addition, the City maintains that it would be willing to clarify by further zoning amendments that the City will follow this interpretation of its Code. (Id.)

as noted above, does not plainly and unambiguously bar operation of an adult business which is more than 400 feet from a protected area merely because a small corner of the lot on which it is located lies within the 400-foot radius of a protected use. Moreover, a purchaser of the Bowling Alley Lot could buy the lot without the portion that lies within the buffer zone and build an adult-oriented establishment on the much larger parcel that complies with the spacing requirements. Another possibility would be to buy the entire lot, partition the small section that does not meet the spacing requirement and dedicate that portion to the City. Then, an adult-oriented business established on the Bowling Alley Lot would unquestionably comply with all spacing requirements. In either case, even without the small segment that lies within the buffer zone, an entrepreneur would still be left with ample space on which to build an adult cabaret.

The Bowling Alley Lot is approximately .67 acres or 29,008 square feet. (*Id*. at 12 (citing May 27 Hr'g Tr. at 132; Def. Hr'g Ex. K).) The City demonstrated through the testimony of Hart and related documentary evidence that the Bowling Alley Lot could support a building of "approximately 6,500 square feet with a 5,000 square foot footprint and a 1,500 square feet of mezzanine space" leaving ample space for the requisite parking, landscaping and bulk criteria.[8] (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 12 (citing May 27 Hr'g Tr. at 252; Def. Hr'g Ex. Q).) Accordingly, the Bowling Alley Lot is deemed an available site which could legally support an adult-oriented establishment.

### 2. Cliff Street Lot

---

[8] We note that Hart's site plans failed to take into account perimeter landscaping and a 10-foot front yard setback as required by the Code. (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 12.) Nevertheless, at the Hearing, Hart explained that his site plans were still feasible and that an adult-oriented cabaret could still be established on the Bowling Alley Lot.

Defendant maintains that a lot located at the intersection of Birch and Cliff Streets in Area B (the "Cliff Street Lot"),[9] is "available." (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 8.) The Cliff Street Lot currently serves as an off-street parking lot for a racquet ball club located directly across Cliff Street. Consequently, plaintiff maintains that even if this site is found to comply with the mandatory locational restrictions of the Code,[10] it still cannot be considered an "available" site because it must be maintained as a parking lot for the racquet club in order for the racquet club to remain in compliance with the Code's provisions regarding off-street parking. (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 11-12.) Plaintiff directs the Court's attention to Section 331-125 of the Code which provides in relevant part:

> All structures and uses shall be provided with a sufficient amount of off-street parking and loading spaces for employees, residents, visitors, clients, patrons, deliverers and other persons at the location of such structures or uses, but not less than the minimum requirements of this chapter. No certificate of occupancy shall be issued for any structure or use, whether for a new structure or a change of use of an existing structure, until all required off-street parking and loading spaces have been established in accordance with this chapter. The continued operation of such facilities in accordance with the requirements of this chapter shall be required as a condition of the continued validity of the certificate of occupancy.

(Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 7 (quoting Zoning Code § 331-125) (citing Zoning Code § 331-126(E) (permitting parking requirement to be met by off premises lots or parking structures located within 250 feet of the use)).) Plaintiff contends that the Cliff Street Lot is

---

[9] The Cliff Street Lot was also referred to as the "Racquet Club Parking Lot" throughout the course of the Hearing.

[10] Although plaintiff's initial map indicated that the Cliff Street Lot was disqualified because a non-conforming residence was located next to it and therefore within 50 feet of that parcel, the parties have since agreed that there is not a non-conforming residence located near the Cliff Street Lot. (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 6.) Consequently, the Cliff Street Lot is not deemed unavailable because of setback requirements.

unavailable for an adult entertainment cabaret because "the parking lot cannot be sold by the racquet club without running afoul of the zoning code." (*Id*.)

However, the City points out that "[a] review of the records in the Westchester County Land Records Division of the County Clerk's Office did not reveal that there has been any restrictive covenant or other legal instrument filed, which would require the Cliff Street Lot to serve as a parking lot for the racquet club in perpetuity." (Def. Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 10.) According to the City, "there is nothing expressly indicating that the [racquet club's] site plan approval was <u>conditioned</u> on the [Cliff Street] Lot being used" to satisfy its off-street parking requirements. (*Id*.) The City maintains that "[t]he racquet club is not precluded from amending its site plan, and providing its parking, for example, at a municipal parking garage." (*Id*. (citing Zoning Code § 331-126(E)(1)).)

We agree with defendant and conclude that the Cliff Street Lot satisfies all the spacing requirements set forth by the Code. We see no reason why the racquet club could not sell the Cliff Street Lot and meet its parking requirements elsewhere, as suggested by defendant. The Cliff Street Lot is a distinct and independent lot which was not included in the deed of the lot on which the racquet club is located.[11] Consequently, we must decide whether the Cliff Street Lot could support an adult-oriented business.

The Cliff Street Lot is approximately .3 acres or 13,446 square feet. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 9 (citing May 27 Hr'g Tr. at 126; Def. Hr'g Ex. K).) Hart, defendant's

---

[11] Plaintiff's reliance on *T&A's, Inc. v. Town of Ramapo*, 109 F. Supp. 2d 161, 169 (S.D.N.Y. 2000) is misplaced. The Cliff Street Lot is an independent lot, whereas the parking lot in *Ramapo* was a legally required part of a parcel that did not comply with the spacing requirements. *Id.* at 169.

architect, demonstrated through testimony and documentary evidence that, taking into account requisite parking, landscaping and bulk criteria,[12] the Cliff Street Lot could "support a building of approximately 3,100 square feet, 2,300 of that being the footprint, and 800 of that being 'mezzanine above the first floor located within the footprint.'" (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 9 (citing May 27 Hr'g Tr. at 249; Def. Hr'g Ex. P).)  Additionally, Hart testified that "the mezzanine above the first floor can be utilized for 'offices or special rooms like VIP lounges or champagne rooms, or things like that, which occur in these kinds of clubs.'" (*Id*.)  Accordingly, we conclude that the Cliff Street Lot is an available lot which could legally support an adult-oriented cabaret.

## B.    Area C

To begin, we note that if an adult-oriented establishment is located on one of the three proposed available lots in Area C, the other two lots would be disqualified from being "available" by operation of the Code's requirement of a 400-foot spacing between adult uses.  (Zoning Code § 331-112 (A)(1).)  However, we will consider each lot deemed by the City to be "available" in determining the amount of land in New Rochelle in which an adult-oriented business could legally operate.

### 1.    Northeast Portman Road Lot

---

[12]Although the City's architect's site plans failed to take into account perimeter landscaping and a 10-foot front yard setback as required by the Code, he explained that the site plans were still feasible and that the plans could be re-worked to account for these requirements. (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 12.)

The City contends that a vacant lot located on the northeast corner of Portman Road (the "Portman Road Lot") is available for adult-oriented use. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 13.) The Portman Road Lot is approximately 8,700 square feet or .2 acres. (*Id*. (citing May 27 Hr'g Tr. at 137).) Plaintiff agrees that this lot meets the spacing requirements and is legally "available" for adult-oriented use, but maintains that it is too small to allow the operation of a modern-day cabaret. (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 12 (citing May 23 Hr'g Tr. at 14-15, 42).)

Hart, taking into account the required bulk, parking and landscaping requirements,[13] demonstrated through testimony and documentary evidence that "one could build an approximately 1,800 square foot building, of which 1,400 square feet is on the first floor, and 400 square feet comprise the mezzanine level." (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 13-14 (citing May 27 Hr'g Tr. at 256; Def. Hr'g Ex. R).) Although 1,800 square feet is smaller than what plaintiff's expert testified is the "minimum" size for a strip club, we agree with defendant that "there is no indication that an 1,800 square foot building is not viable for a commercial enterprise, or that the site would not be available for other adult-oriented businesses." (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 14 n.17 (citing May 23 Hr'g Tr. at 152-60).) Plaintiff's expert testified about the "minimum" size generally, and not with specific regard to Westchester County and the surrounding region.[14]

---

[13] We note that Hart's site plans failed to take into account perimeter landscaping and a 10-foot front yard setback as required by the Code. (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 12.) Nevertheless, at the Hearing, Hart explained that his site plans were still feasible and that an adult-oriented cabaret could still be established on the proposed lots.

[14] McLaughlin, plaintiff's expert, did not specifically indicate the location of the clubs he observed. (Def. Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 11.) We agree with defendant that one cannot compare the size of an adult-oriented club located in Palm Beach, Las Vegas or Miami to one located in New Rochelle. (*Id*.) A more appropriate comparison would be to adult-

(Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 14 n.17 (citing May 23 Hr'g Tr. at 152-60).) Moreover, even if this lot is too small for a commercially viable adult cabaret, which we do not believe, it could obviously be utilized for another adult business such as an adult bookstore. Accordingly, the City has established that the Portman Road Lot is an available location for an adult-oriented business.

## 2.      Humane Society Lot

The parties agree that a lot located directly south of the Portman Road Lot, which currently consists of a building housing the Humane Society (the "Humane Society Lot"), is an available lot for an adult-oriented business.  (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 12; Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 14.)  The Humane Society Lot is approximately 39,819 square feet or .9 acres.  (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 14.)  Hart testified that, taking into account bulk, parking and landscaping, the Humane Society Lot could accommodate a building of approximately 8,300 square feet, of which the first floor is 5,227 square feet and the mezzanine is 3,073 square feet.[15]  (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 14 (citing May 27 Hr'g Tr. at 256; Def. Hr'g Ex. R).)  In addition, Hart testified that "an entrepreneur could theoretically purchase

---

oriented clubs in the Westchester, Putnam and Rockland areas.  (*Id.*)  Defendant's expert testified that "a review of the sizes of seven (7) area topless clubs indicates that such establishments in the [local] region range from 1,000 square feet (Billy Buds, the pre-existing topless club in New Rochelle), to 5,720 square feet (Stiletto, in Nanuet, Rockland County)."  (*Id.* (citing May 27 Hr'g Tr. at 152-60).)

[15] Again, we note that Hart's site plans failed to take into account perimeter landscaping and a 10-foot front yard setback as required by the Code.  (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 12.)  However, at the Hearing, Hart explained that his site plans were still feasible and that an adult-oriented cabaret could still be established on the proposed lots.

both the Humane Society Lot and the Northeast Portman Road Lot, which would yield the potential for an even larger building." (*Id*.)

Consequently, the Humane Society Lot has been established to be an available alternative location for an adult-oriented use.

### 3. Sharot Street Lot

The last lot in Area C that the City contends is "available" is located on the west side of Portman Road, at the intersection of Sharot Street and Portman Road (the "Sharot Street Lot"). (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 15 (citing Def. Hr'g Ex. I).) The City maintains that the Sharot Street Lot is 400.14 to 400.45 feet from the nearest residential district; however, plaintiff contends that this Lot is 398.12 feet from the nearest residential district and thus not available. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 15 (citing May 27 Hr'g Tr. at 224; Pl. Hr'g Ex. 10).) Nevertheless, the City stated that "due to the 'foot or less-than-a-foot discrepancy between the measurements,' Counsel for the City . . . 'offer[ed] a stipulation that as to [the Sharot Street Lot], the City's measurement exceeds 400 feet, and the City would be bound by the measurement of 400 feet from the setback of the sensitive area.'" (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 15 (citing May 27 Hr'g Tr. at 182-83).) In addition, defendant notes that where there is such a minute discrepancy, as here, the Court should take into account the margin of error inherent in GIS data. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 15.) We agree with defendant that the Sharot Street Lot meets the spacing requirements. The discrepancy is *de minimis* and is well within the margin of error in cartographic measurements. Both parties produced evidence supporting their position, and it is up to the Court to decide which measurement is more reliable. However, the City is willing

to stipulate and be bound by the measurement of 400 feet from the nearest point of the residential district.  Furthermore, we note again that the allegedly encroaching two feet can be partitioned from the rest of the lot.  Accordingly, we conclude that the Sharot Street Lot meets all spacing requirements and must now consider whether the Sharot Street Lot is available for an adult-oriented use.

The Sharot Street Lot is approximately 9,379 square feet or approximately .22 acres.  ((Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 15 (citing May 27 Hr'g Tr. at 137; Def. Hr'g Ex. K).)  Plaintiff maintains that this site is too small to support the establishment of an adult cabaret.  (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 13 n.8.)  Defendant, however, offered testimony and evidence that the Sharot Street Lot could accommodate "an approximately 2,100 square foot building, of which 1,700 square feet are located on the ground floor, and a mezzanine of 400 square feet" taking into account all bulk, parking and landscaping criteria.[16]  (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 15 (citing May 27 Hr'g Tr. at 258; Def. Hr'g Ex. S).)  Accordingly, we conclude that the Sharot Street Lot is "available" for an adult-oriented use.

### C.      Area D

#### 1.      Area D Lot

The City contends that the southern lot on Cedar Street in Area D, where MacMenamin's Restaurant is currently located, is "available" and that this lot could be combined with a smaller

---

[16] Although Hart's site plans failed to take into account perimeter landscaping and a 10-foot front yard setback as required by the Code, Hart testified at the Hearing that his site plans could be modified and that the site could still accommodate an adult cabaret.  (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 12; May 27 Hr'g Tr. at 258.)

second lot to produce a single, larger lot ( jointly the "Area D Lot") for an adult-oriented business. Defendant maintains that the Area D Lot meets all the spacing criteria in that it is 400 feet from the nearest zoning district that permits residential uses as a principal use (the "DMU District") and there are no residences within 400 feet of this lot. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 16.) Plaintiff, however, maintains that the Area D Lot is unavailable because it is within 400 feet from the DMU District line. (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 8.) According to plaintiff, the City's zoning law requires that "when measuring the separation between an adult use and the use from which it must be distanced, the measurement is to be made to the boundary line of a zoning district" and that when this is done, the proposed Area D Lot does not meet the 400-foot spacing requirement. (*Id.*)

The only reason for the parties' differing conclusions about whether the buffer zone encroaches on the Area D Lot is the point from which they measure. Plaintiff measures from the boundary line of the DMU District line as it appears on the City of New Rochelle's official zoning map, as required under the Code, which is at the northwest boundary of the indicated railroad right-of-way at the corner of Garden and Cedar Streets. (*Id.* at 9-10; Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 17.) Defendant measures from what it contends is the DMU District line, at the southeast boundary of the railroad right-of-way. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 17.) The City maintains that its measurement is more accurate and should be used by the Court because:

> [e]ven though the railroad right-of-way is located within the DMU district, for all intents and purposes, it is a state-owned right-of-way. It's owned by Metro-North Railroad, and the City of New Rochelle has no control over the zoning. . . . for [sic] practical purposes, the right-of-way, since it's owned by a state agency, is not subject to the authority of the City of New Rochelle Zoning Code. So basically our interpretation was to exclude that from our distance parameter.

(*Id.* (quoting May 27 Hr'g Tr. at 144-45).) Plaintiff, however, contends that the DMU District

boundary line follows Garden Street and Cedar Street and, if you follow the rule of interpretation found in the City's Code, the starting point of measurement should be the corner of Garden Street and Cedar Street because that is where the DMU District boundary line is found on the City's official zoning map.  (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 9 (citing May 27 Hr'g Tr. at 189-91).)  Thus, plaintiff contends that defendant's claim that the Area D Lot is available for an adult-oriented use is premised on "ignoring the language of the zoning code and arbitrarily choosing the *wrong* location from which to measure the buffer zone."  (Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 10 (emphasis in original).)

The City has committed that for zoning purposes it would measure the DMU District buffer zone from the south side of the right-of-way and refrain from enforcing the ordinances related to adult-oriented establishments against the Area D Lot.  The City's interpretation of the point from which to measure is not arbitrary because New Rochelle does not have jurisdiction to control zoning of the area in which the railroad right-of-way is located.  Because the City agrees to stipulate to that effect, it will be bound by this interpretation.  Consequently, we conclude that the Area D Lot meets the spacing requirements.

The larger portion of the Area D Lot is approximately 12,343 square feet or .28 of an acre and the second smaller lot is approximately 7,289 square feet or .17 of an acre.  (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 16.)  The two lots are adjoining and thus could be merged into a single lot containing approximately 19,632 square feet or .45 of an acre.  According to defendant, "[i]f the two lots in Area D are combined, the property could yield a building of approximately 3,800 square feet, of which 2,850 square feet is on the first floor, with a mezzanine of 950 square feet."  (*Id.* (citing May 27 Hr'g Tr. at 259; Def. Hr'g Ex. T).)  Plaintiff does not contend that this parcel is insufficient

to support an adult-oriented cabaret.  Accordingly, we conclude that the Area D Lot (either the larger lot standing alone or the two adjoining lots combined) is "available" for an adult-oriented use.

## DISCUSSION

### I.   Motion for Preliminary Injunction

#### A.   Standard for Preliminary Injunction

A party seeking a preliminary injunction must establish: (1) irreparable harm; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.  *See Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). However, "[w]here, as here, the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party is entitled to a preliminary injunction only if he can demonstrate a likelihood of success on the merits.  *Latino Officers Ass'n*, 170 F.3d at 171; *see also Union Carbide Agric. Prods. Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir. 1980).  "The purpose of a preliminary injunction is to preserve the status quo between parties pending a final determination of the merits."  *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 692 (2d Cir. 1998).  Only after the legal requirements for an injunction are met, may this Court exercise its equity jurisdiction to mold a decree to the necessities of the case.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

#### B.   Irreparable Harm

It is widely-recognized that "[v]iolations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery v. City of New York*, 97 F.3d 689, 693-94 (2d Cir. 1996) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (noting that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); 11A CHARLES A. WRIGHT, ARTHUR R. MILLER AND MARY KANE, *Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995) (noting that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary")).  Consequently, by the very nature of the allegations, plaintiff has demonstrated irreparable harm for purposes of determining whether a preliminary injunction is appropriate.

**C.  Likelihood of Success on the Merits**

**1.  First Amendment Principles**

It is well-settled that zoning ordinances that are intended to reduce the undesirable secondary effects of adult entertainment businesses are to be reviewed under the standards applicable to regulations that regulate time and place in a content-neutral manner. *See City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 49 (1986); *see also Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998); *MJ Entm't Enter., Inc. v. City of Mount Vernon*, 328 F. Supp. 2d 480, 484 (S.D.N.Y. 2004).  Because the portions of the Code regulating adult entertainment establishments are content-neutral, time, place and manner restrictions enacted in response to the community's concern for the negative secondary effects associated with adult entertainment, the proper inquiry in this case is whether the ordinance is "'designed to serve a substantial governmental interest and allows for

reasonable alternative communication.'"[17]  *MJ Ent't*, 328 F. Supp. 2d at 484 (quoting *Renton*, 475

U.S. at 50).  In the case at bar, the central issue with respect to the present motion is whether the

Code leaves open sufficient alternative avenues of communication.

In addition, plaintiff maintains that even if the Court finds that there are available alternative

sites that would permit adult entertainment, the Code is still unconstitutional because it requires "all

adult uses to obtain a special permit as a condition of operation pursuant to a process that is both

discretionary and subject to undue delay."  (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 15.)

Therefore, according to plaintiff, none of the sites proposed by New Rochelle "count for purposes

of assessing the adequacy of the alternative avenues of expression because the First Amendment

requires adequate sites where adult businesses may locate as a matter of right."  (*Id.*)  Consequently,

we will consider the special permit issue first.

### 2.    Special Permits

New Rochelle's Code requires that all adult entertainment establishments obtain a special

use permit prior to being permitted to open.  (Zoning Code §§ 331-29, 331-59.)  Under the City's

amended zoning law,

> a permit can be denied if the Planning Board, among other things, finds the business
> [will] not . . . be "consistent with the character of the surrounding structures" or
> [will] "detract from the appearance of the neighborhood."[18]   Additionally, the

---

[17] This standard applies to claims under both the federal and New York State
Constitutions.  *See Hickerson v. New York*, 146 F.3d 99, 104 (2d Cir. 1998).

[18] Although plaintiff asserts that a permit can be denied if the "business" is not
"consistent with the character of the surrounding structures" or "detract[s] from the appearance
of the neighborhood," the City correctly points out that this condition pertains to "[t]he exterior
appearance of any building containing an adult-oriented use," not to the business itself.  (Def.

Planning Board or Sign Review Board may impose any additional terms and conditions on the site plan, which is a requisite part of the application process, that those boards determine will "further the aims of this section," including but not limited to restrictions on the location and placement or advertising, street promotion, outdoor window displays and signage, the location of merchandise and hours of operation.

(Pl. Resp. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 17 (quotations omitted from original).) Consequently, plaintiff contends that the Code gives officials too much discretion and is therefore unconstitutional. (*Id*.)

In addition, plaintiff maintains that New Rochelle's Code "runs afoul of the requirement that a decision granting or denying a permit to engage in expression must be rendered in a brief, unspecified period of time." (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 18.) According to plaintiff, "[u]nder New Rochelle's permit scheme, the City can take nearly 200 days–or even longer–to decide to issue a special permit." (*Id*. at 18-19.) Consequently, plaintiff maintains that even if the City is correct that there are available alternative sites in New Rochelle, they "cannot even be properly counted in evaluating the constitutionality of New Rochelle's ordinance because there are actually ***no sites*** where an adult use can open as a matter of right." (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 15 (emphasis in original).)

The City contends that plaintiff does not have the requisite standing to raise a challenge to the Code's provisions relating to special use permits because under the Code an adult-oriented establishment is permitted to locate only in the I and LI Districts, and plaintiff is located in the Downtown Business District, which does not permit adult-oriented establishments by special permit or otherwise. (Def. Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 13.) Consequently, the City

Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 17-18.)

asserts that since plaintiff is not adversely affected by the law requiring a special use permit, plaintiff has failed to allege an "injury in fact"; in other words, plaintiff's "inability to operate an adult entertainment establishment in its present location, cannot be traced to the procedures for obtaining a special use permit." (*Id*.)

We agree with the City that plaintiff does not have standing to assert that the Code is unconstitutional based on the special use permit provisions because plaintiff has not alleged an injury in fact, i.e., plaintiff's inability to operate an adult-oriented cabaret at its current location is not attributable to the requirement of a special use permit. *See MJ Entm't Enter. v. City of Mount Vernon*, 234 F. Supp. 2d 306, 311-12 (S.D.N.Y. 2002). However, the special use permit requirement is relevant to plaintiff's assertion that there are no available avenues of communication in New Rochelle because plaintiff maintains that any allegedly "available" site is illusory because of the unfettered discretion of the Planning Board and the Sign Review Board and the possibility of undue delay in obtaining a decision on a special permit application. (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 20.) Therefore, we must consider the special use permit provisions to the extent of deciding whether they make the sites we found to be "available," illusory in that an entrepreneur cannot, as a matter of right, open and operate an adult-oriented establishment on any of those sites.

It is well-settled that the requirement of a special use permit for an adult entertainment business is a permissible and appropriate zoning control. *See, e.g., Marty's Adult World of Enfield, Inc. v. Town of Enfield*, 20 F.3d 512, 515-16 (2d Cir. 1994). However, because there is no district in New Rochelle in which an adult-oriented establishment could operate without a special use permit, the City's special use permit ordinance is a prior restraint and must be analyzed as a licensing scheme. *See Crown Street Enter. v. City of New Haven*, 989 F. Supp. 420, 423-24 (D. Conn. 1997)

(noting that "when a business need only move from one part of a city to another in order to avoid [a] prior restraint" the full range of prior restraint safeguards associated with licensing schemes is not applicable).

There is a strong presumption against the use of prior restraints when dealing with expressive activity protected by the First Amendment. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (noting that prior restraints "are the most serious and the least tolerable infringement on First Amendment rights"). "It is well settled 'that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *R.W.B. of Riverview, Inc. v. Stemple*, 111 F. Supp. 2d 748, 756 (S.D.W. Va. 2000) (quoting *11126 Baltimore Blvd., Inc. v. Prince George's County*, 58 F.3d 988, 997 (4th Cir. 1995) (quoting *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988))). Consequently, "[a]n ordinance that gives public officials the power to decide whether to permit expressive activity must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid." *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999). Thus, a special permit system that includes objective standards that limit a government's discretion and provides "narrow, objective, and definite standards" to control an official's discretion will pass constitutional muster. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969); *see also Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998). In addition, with respect to the amount of time in which a decisionmaker must issue a special use permit, the Supreme Court requires that the license for a First Amendment-protected business be issued within a reasonable amount of time. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 780-81 (2004). "[A] determination of the reasonableness

of the time period during which the restraint on speech may constitutionally operate requires an examination of the type of judgments to be made by the government officials and the hardship placed on the class of applicants by the restraint." *11126 Baltimore Blvd.*, 58 F.3d at 997. Thus, if New Rochelle's ordinance requiring special permits for adult-oriented uses grants the governmental body unbridled discretion or fails to place limits on the time within which the decisionmaker must issue the special use permit, it must be held unconstitutional. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990); *Lakewood*, 486 U.S. at 757; *Lady J. Lingerie*, 176 F.3d at 1362. Accordingly, we will now consider whether New Rochelle's Code provisions requiring special use permits provide objective and reasonable standards and a reasonable time frame in which decisions on applications for permits must be rendered.

### a. Discretion

The specific provisions governing adult-oriented establishments that plaintiff maintains confer unbridled discretion on the City's Planning Board are those establishing the following requirements: (1) screening of the establishment through the use of fences, walls, landscaping or other measures; (2) consistency of the exterior appearance of the building with the character of the neighborhood; (3) for renewal of a permit, compliance with the terms of the permit, and all applicable statutes, laws, ordinances, codes, rules and regulations; and (4) any additional terms and conditions on the site plan, that the Planning Board or Sign Review Board determines will "further the aims of the section" including restrictions on location and placement or advertising, street promotion, outdoor and window displays and signage, the location of merchandise and hours of operation. (Pl. Post-Hr'g Brief Supp. Mot. Prelim. at 16-17.) Although plaintiff asserts that these provisions confer unbridled discretion on the City's Planning Board, plaintiff fails to specify any

respect in which the discretion is impermissibly broad.

The provisions that plaintiff challenges do not seek to censor expressive activity; rather, they impose "reasonably objective, nondiscretionary criteria unrelated to the content" of the expressive activity. *See City of Littleton*, 541 U.S. at 783. The provisions in the case at bar are similar to those in *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634 (4th Cir. 1999), wherein the court concluded that the ordinances "address the well-known variables inherent in any development (e.g., appearance of the proposed building, dedication of street and utility rights of way to the public, drainage systems, signage, etc.) that local governments have long been permitted to consider as a matter of their traditional land-use authority." *Id.* at 639. The Fourth Circuit noted that "[r]ather than allowing the decisionmaking body to manipulate such malleable concepts as welfare, decency, and good order, [the ordinance] channels the [agency's] discretion, forcing it to focus on concrete topics that generate palpable effects on the surrounding neighborhood." *Id.* The provisions in New Rochelle's Code likewise deal with objective content-neutral criteria that are not unlike the standards many other businesses are required to satisfy; thus, the provisions do not confer unbridled discretion on the Zoning Board. We cannot assume that the Zoning Board will act in an improper manner in deciding whether to grant a special use permit. In the case at bar, we are merely trying to discern whether there are in fact available alternative avenues of communication in which an adult-oriented establishment could operate. The discretion conferred to the Zoning Board in the present case does not make the sites we found to be "available" for adult-oriented use illusory because the provisions deal with legitimate land use concerns and reasonable limitation of the negative secondary effects. The provisions properly and reasonably provide specific criteria which the Board must assess in determining whether to issue a special use permit.

**b.** **Time Limits**

As stated earlier, the law is clear that a special permit ordinance relating to First Amendment expression must set forth "definite limitations on time" within which a decision of whether to issue the special permit is made and the time limitations must be "reasonable." *See FW/PBS*, 493 U.S. at 225-26 ("A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech."). In the case at bar, plaintiff maintains that the entire set of deadlines set forth in the Code is illusory because the time frames do not begin to run until the application is "complete." (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 19.) However, we agree with defendant that it is necessary for a Planning Board to determine the completeness of an application prior to considering it because otherwise the Planning Board could be mid-way through the process before it realizes that part of the application is missing; this would be a waste of time for both the Planning Board and the applicant. (Def. Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 20.) Requiring a complete application is a regular practice and does not render an ordinance constitutionally defective. *See, e.g., Steakhouse*, 166 F.3d at 640 (approving special permit ordinance in which the time frame for decisionmaking began to run upon the filing of a "completed application").

Additionally, plaintiff maintains that "a decision on an application for a special permit may take as long as 197 days"[19] and thus "does not comport with the constitutional mandate that a permit

---

[19] Plaintiff derives the 197-day figure from the following time limitations set forth in the Code:

> once an application is accepted, it must be forwarded after ten days to other city agencies; these agencies are given 30 days from the date the application is forwarded to them to submit reports or comments. § 331-88(B)(1). A public hearing must be set within 62 days of the date that an application is received. § 331-88(B)(3). The hearing must be closed within 90 days of the first date set for hearing. § 331-

decision be made within a brief, specified period of time." (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 19.) Defendant contends that the 62-day period for a hearing is reasonable because "the Planning Board only meets once a month, and, during this 62-day period, notice must be published in the newspaper, and notice must be given to surrounding property owners, adjacent municipalities, and the County." (Def. Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 21.) Additionally, the City contends that the 45-day period, from when the public hearing is closed, in which the Planning Board must render a decision on special permits is also reasonable, particularly when it is not known how much documentation and evidence must be reviewed by the Board. (*Id.*)

As the City correctly points out, plaintiff's planned establishment is a topless dancing cabaret which is a place of public assembly, where liquor is usually served and live performances occur. (*Id.* at 22.) As a result, "[t]raffic concerns, as well as possible negative secondary impacts on the neighborhood, . . ., including concerns over prostitution and crime" need to be considered. (*Id.*) In addition, "[t]he building itself must meet sufficient fire, safety, and other criteria to allow for these public gatherings." (*Id.*) "Determining whether a topless bar strains public services and imposes adverse secondary effects on neighboring landowners requires the [Planning Board] to analyze several complex considerations. Moreover, the procedures involved in coming to a decision require some time." *Steakhouse*, 166 F.3d at 640. Consequently, we agree with the City that under the circumstances it is not unreasonable for the Planning Board to take up to 197 days to make its

---

112(I)(2). The Planning Board has 45 days from the date the public hearing is closed to make its decision. § 331-88(B)(5).

(Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 19.) Additionally, the City points out that the provision that requires the Planning Board to forward the application to other agencies for review was intended to read "within" 10 days, rather than "after" 10 days and has already been ministerially corrected. (Def. Reply Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 21 n.13.)

determination of whether to issue a special use permit for an adult entertainment establishment.

Moreover, plaintiff contends that the 197-day time frame is illusory because section 331-88(B)(7) of the Code provides that "[t]he Planning Board's failure, if any, to comply with any of the procedures set forth herein shall not be deemed approval of the application." Plaintiff therefore maintains that "if New Rochelle's Planning Board violates, ignores or dispenses with any of the time restrictions outlined above, there is no consequence. Thus the time frames set forth in the . . . ordinance are all illusory, for the . . . ordinance expressly rules out any consequences if the Planning Board chooses to ignore them." (Pl. Post-Hr'g Brief Supp. Mot. Prelim. Inj. at 20.) Again, we note that plaintiff does not have standing to challenge the constitutionality of the special use permit provisions, thus we are merely reviewing the provisions to determine whether there are in fact available alternative avenues of communication for adult-oriented expression. We cannot assume that the Zoning Board would act improperly or purposely delay rendering a decision with respect to the special use permit. Consequently, we conclude that New Rochelle's Code provisions relating to special use permits for adult-oriented uses provides reasonable, definite time frames sufficient to allow for alternative avenues of communication.

### c. Whether Available Alternative Avenues of Communication Are Illusory Because of Special Use Permit Requirement

Because we conclude that New Rochelle's special use permit provisions provide objective, content-neutral criteria and reasonable time limits within which a determination will be made, we hold that the available alternative avenues of communication we found to be present in New Rochelle are not rendered illusory by the special use permit requirements. Consequently, we must now consider whether the available alternative avenues of communication are sufficient to withstand plaintiff's constitutional attack.

### 3.  Alternative Avenues of Communication

A court must consider the "physical and legal availability of alternative sites within the municipality's borders and whether those sites are part of an actual business real estate market" when determining whether reasonable avenues of communication exist. *Hickerson*, 146 F.3d at 104 (quoting *Stringfellow's of New York, Ltd. v. City of New York*, 91 N.Y.2d 382, 402, 671 N.Y.S.2d 406, 694 N.E.2d 407 (1998)).  The First Amendment mandates "only" that New Rochelle "'refrain from effectively denying respondents a reasonable opportunity to open and operate an adult [entertainment business] within the city.'  Federal courts, therefore, have found that reasonable alternative avenues of communication exist if there is sufficient land area, in all states of development, open for use by adult businesses." *MJ Ent't*, 328 F. Supp. 2d at 484 (quoting *Renton*, 475 U.S. at 54.)  Under *Renton*, sites may be deemed "available" irrespective of whether other businesses already occupy them or additional work must be done before the sites would be suitable for adult entertainment. *Renton*, 475 U.S. at 53; *see also Hickerson*, 146 F.3d at 106 (acknowledging that "[u]nder *Renton*, land that is already occupied by commercial and manufacturing facilities and undeveloped land that is not for sale or lease is not to be automatically deemed unavailable . . . any reduction in profitability caused by a forced relocation is not relevant to the availability inquiry") (quoting *Stringfellow's*, 91 N.Y.2d at 402).

After careful consideration of the parties' respective submissions, we concluded that there are six sites in New Rochelle that are available avenues of communication in which an adult-oriented establishment could legally operate.  (Background, Part II.)  Consequently, we must now decide whether this is sufficient to meet the constitutional requirement of alternative avenues of

communication.

On the strictest counting, there are four lots totaling 2.07 acres[20] available for adult-oriented use. Taking into account the two additional lots that the City has stipulated are available and is therefore estopped from enforcing the Code against them, as discussed above, we conclude that there are an additional .67 acres[21] for a total of 2.74 acres available for adult-oriented use. There are 98.84 acres in New Rochelle's LI District. (Def. Post-Hr'g Brief Opp. Mot. Prelim. Inj. at 3.) The lesser total of 2.07 acres available for adult-oriented business represents 2.09% of the LI District, while the greater total of 2.74 acres constitutes 2.77% of the LI District.

"Courts have considered a variety of criteria, from the percent of land allocated to such uses to the supply and demand within the population, e.g., the number of sites compared with the number of adult businesses currently in operation or seeking to open" in determining whether a sufficient amount of alternative avenues of communication exist. *MJ Entm't*, 328 F. Supp. 2d at 485. "Although *Renton* referred to the percent of total land available, district courts have not been precise as to whether the relevant percent is based on the total land or the percent of land available for commercial uses and have applied both methods." *Id.* We agree with the court in *MJ Entertainment* that the relevant inquiry for a city such as New Rochelle, is the total commercial area, rather than the total land area because like Mount Vernon, New Rochelle is an old suburb: "[i]t is fully 'built

---

[20] This calculation includes the Bowling Alley Lot, the Cliff Street Lot and the combination of the Humane Society Lot and Northeast Portman Road Lot. The areas of these lots are respectively as follows: .67 acres, .3 acres, .9 acres and .2 acres.

[21] These comprise the Sharot Street Lot of .22 acres and the Area D Lot which consists of two smaller parcels of .28 acres and .17 acres respectively. Although as previously noted only one of the lots in Area C could be utilized for an adult-oriented business because of the spacing required between such businesses, we deem it appropriate to consider all three lots in determining the total acreage available in New Rochelle.

out'; there is very little undeveloped land" and the character of the municipality as overwhelmingly residential is already set. *Id.*

We begin our analysis by noting that "[s]ince context is so very important and so fact-specific, it necessarily limits the precedential value of any particular decision." *Id.* at 487-88 (citations omitted). Thus, decisions dealing with local zoning ordinances and balancing the ordinances with First Amendment rights have limited precedential value because of the highly fact-specific nature of the analysis; the character and needs of a municipality differ depending on the unique characteristics of each community. *See, e.g., Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 790 (6th Cir. 2004) (noting that it is well-accepted that there is "no bright line rule [which] exist[s] on what the City [is] minimally required to allow"); *Int'l Food & Beverages Sys. v. City of Ft. Lauderdale*, 794 F.2d 1520, 1526 (11th Cir. 1986) (noting that an analysis of alternative avenues of communication requires "reference to the community needs, the incidence of nude bars in other comparable communities, the goals of the city plan, and the kind of city the plan works towards").

For this reason, prior decisions involving other communities offer little guidance in determining the number and acreage of lots available for adult-oriented businesses in the City of New Rochelle that would be sufficient to constitute reasonable avenues of communication. However, there is at least one precedent that cannot be ignored, not only because it was a recent decision of the same branch of this Court, but also because it concerned the City of Mount Vernon, New York, which directly adjoins New Rochelle and is strikingly comparable in many respects. Both are basically "bedroom suburbs" of nearby New York City. Mount Vernon has a population of 68,000 as compared to New Rochelle's 72,000. Both communities are almost fully developed,

with 87% of Mount Vernon's area devoted to residential use, while New Rochelle is over 95% residential. Mount Vernon permits adult-oriented business only its industrial (I) district and New Rochelle only in its I and LI Districts, and both require a special permit for such businesses. Mount Vernon and New Rochelle each have one cabaret featuring topless dancing that is currently operating under a "grandfather" privilege, having begun operations before adoption of a zoning code proscribing such businesses in its present location. Mount Vernon's zoning code bars adult-oriented businesses within 500 feet of a residential zone while New Rochelle's Code did likewise until it was amended on June 14, 2005 to reduce the buffer zone to 400 feet. Application of its buffer-zone requirements left in Mount Vernon four lots with a total of 2.35 acres available for adult-business use, although the proximity of those lots to one another and the code requirement that such businesses be spaced no closer than 1000 feet apart would permit only one of the four lots actually to be so utilized. Even counting the acreage of all four lots, the total available area constitutes only 0.84% of the area of Mount Vernon's I zone. In New Rochelle, as noted, there are as many as six lots available for adult-business use, with a total area of 2.74 acres, or 2.77% of the LI zone.

In *MJ Entertainment*, Judge MacMahon of this court, after a thorough consideration of all the relevant factors, ruled that Mount Vernon's zoning code provided sufficient alternative avenues of communication to satisfy constitutional standards. Among other things, she noted that "area residents are not lacking in adult entertainment options" and that Mount Vernon adjoins New York City, where "hundreds of adult entertainment venues are readily accessible . . . by public transportation in many forms." 328 F. Supp. 2d at 488. We recognize that the Supreme Court in *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981), ruled that in evaluating the constitutionality of a local regulation, it is improper to rely on the availability of avenues of expression beyond the

borders of the municipality in question. However, where, as here, the municipality has not zoned out all adult-oriented businesses, it seems altogether appropriate, in determining whether the sites that remain available for such businesses afford reasonable opportunities for communication, to consider the level of public demand for adult entertainment and the extent to which that demand can already be satisfied by traveling short distances to venues outside the community.

Almost every factor that Judge MacMahon weighed in ruling that the Mount Vernon code passed constitutional muster is present here and, as to most of the factors, even more persuasively. To rule that the New Rochelle Code is unconstitutional would flout the principle of equal treatment under the law.

As previously mentioned, there is no bright-line test for determining how much land is required for the provision of reasonable avenues of communication. However, we note that "courts have routinely upheld zoning ordinances where less than 1% of the land was available for adult businesses to operate." *MJ Entm't*, 328 F. Supp. 2d at 485-86 (collecting cases). Thus, given the circumstances in the present case and the particular context of New Rochelle, as a fully-developed, predominantly residential "bedroom suburb" of New York City, we conclude that the Code permits reasonable alternative avenues of communication for adult-oriented businesses. In particular, the following factors contributed to this conclusion: (1) New Rochelle has not sought to zone out all adult-oriented business; (2) New Rochelle's amended zoning Code allows pre-existing non-conforming adult-oriented establishments such as Billy Bud's to continue operating in their current locations indefinitely; (3) this Code was deliberately drawn to allow a reasonable number of alternative sites for adult-oriented businesses; (4) as a predominately residential community, New Rochelle has a very limited amount of property available for commercial use; and (5) New Rochelle

has a substantial government interest in curtailing undeniable negative secondary effects of adult-oriented businesses.

The City of New Rochelle has in recent years been zealously pursuing an urban improvement program designed to revitalize the City, clean up and modernize its downtown area and burnish its image as a wholesome, upscale community of homes, churches and schools. A key element in that redevelopment program was the construction in midtown of New Roc City, a large complex incorporating a 100-room Marriott Residence Inn, stores, restaurants and family entertainment facilities including movie theaters, a bowling alley and skating rink. Plaintiff's cabaret, Casanova Gold, is directly across the street from New Roc City. If the city ordinance barring adult-oriented businesses in that area is ruled unconstitutional, plaintiff will offer adult entertainment including topless dancing at that location. The City administration fears that this would drastically alter the atmosphere of the area and seriously set back the progress that has been made toward presenting it as a center for wholesome family recreation. There is ample reason for such fears. In *MJ Entertainment*, the court noted that, in a comparable adult cabaret in adjoining Mount Vernon, in one five-year period there were "574 incidents requiring police attention . . . including 30 fights, 4 grand larcenies, a bomb threat and numerous shots fired, robberies, assaults and disorderly conduct." 328 F. Supp. 2d at 482.

The City of New Rochelle has already had tangible indications of the adverse economic effects of the establishment of an adult entertainment cabaret at plaintiff's premises. On June 13, 2005, defendant learned that "a major corporate user of the Marriott Residence Inn . . . pulled its contract for a block of 28 rooms, and moved its employees to White Plains." (Mayor Idoni Aff. ¶ 6.) Defendant states that they were told that the reason for the cancellation of the contract with

Mariott was that "the business did not wish to be 'in a red light district,' and did not want to be associated with or proximate to an adult-oriented business." (*Id*. ¶ 7.) According to defendant, "this will translate to approximately $750,000 in lost revenue to the hotel alone. The associated revenue lost to other businesses as a result of the cancellation of the contract, such as the surrounding stores and restaurants, is projected to equate to an additional $300,000." (*Id*. ¶ 8.)

In any case, such as this, in which equitable relief is sought, the Court must be cognizant of the practical consequences of its decision. Granting the preliminary injunction sought by plaintiff will probably enrich plaintiff and please a limited number of patrons of plaintiff's cabaret, but at what the administration and an overwhelming majority of the residents of the City would agree is a frightful cost in terms of the community's quality of life, economic prospects and property values. Such a lopsided result should be ordained only on a clear showing of legal and equitable entitlement to the relief sought. No such showing has been made in this case.

For all the foregoing reasons, we conclude that New Rochelle's zoning code presently in effect provides sufficient avenues of communication for adult-oriented businesses to pass constitutional muster. Plaintiff's motion for a preliminary injunction is therefore denied.

## II.    Motion to Dismiss

Defendant moves to dismiss the action in its entirety on the basis that plaintiff's claims have been rendered moot by the City's amendments to the Code. (Def. Mem. Supp. Mot. Dismiss at 1.) However, plaintiff maintains that the amendments do not moot plaintiff's challenges to New Rochelle's zoning laws because even with the amendments, the City's zoning ordinances regulating adult-oriented businesses are still unconstitutional. (Pl. Mem. Opp. Mot. Dismiss at 1-2.)

Throughout the course of this action, both the parties and the Court have considered the issue in litigation to be the constitutionality of the City's Code as amended on June 14, 2005. Although the pre-amendment Code has been supplanted and no longer exists, the action is not moot; we will simply continue to treat the action as a challenge to the constitutionality of the amended Code. Accordingly, defendant's motion to dismiss is denied.

_____However, with respect to defendant's assertion that plaintiff lacks standing to challenge the constitutionality of the special use permit requirements, we agree for the reasons stated above in Discussion Section I.C.2. Accordingly, plaintiff's claims relating to the constitutionality of the special use permit provisions are hereby dismissed.

Lastly, we must address plaintiff's assertion that plaintiff established itself as an adult entertainment cabaret by presenting topless dance performances at its premises on April 19, 20 and 21, 2005, thus establishing "a pre-existing, non-conforming use under the City's zoning code."[22] (Pl. Mem. Opp. Mot. Dismiss at 3.) However, as the City correctly points out, the Code specifically states that "'no use shall be established, which would be in contravention of a proposed amendment to the textual or map provisions of this [Zoning Code] for which a public hearing has been set or

---

[22] In making this assertion, plaintiff relies on Section 331-12 of the Code, entitled "Continuing existing uses, buildings and structures," which states in relevant part:

> Except as otherwise provided herein, the lawfully permitted use of lands or buildings and the lawfully permitted existence of buildings and structures at the time of adoption of this chapter may be continued although such use, building or structure does not conform to the standards specified in this chapter for the district in which such lands, buildings or structures are located. Similarly, whenever a zoning classification or the restrictions affecting property within a district shall be changed hereafter so as to render nonconforming a use, building or structure then presently lawfully existing, such use, building or structure may nevertheless continue subject to the conditions set forth below. Said uses shall be deemed nonconforming uses and said buildings and structures shall be deemed dimensionally nonconforming.

(Pl. Mem. Opp. Mot. Dismiss at 5 (quoting Zoning Code § 331-12).)

held by the City Council.'" (Def. Reply Mem. Supp. Mot. Dismiss at 6 (quoting Zoning Code § 331-147.1).)  A public hearing on the proposed amended Code permitting adult-oriented businesses only in the LI and I Districts, was set on April 12, 2005 – a week before any topless dancing occurred at plaintiff's establishment.  (Def. Reply Mem. Supp. Mot. Dismiss at 6.)  Thus, plaintiff, whose cabaret is located in the Downtown Business District, did not legally "establish" a pre-existing use.

Moreover, plaintiff has not demonstrated that it has a substantial vested right in a pre-existing, non-conforming adult-oriented use because plaintiff did not make any substantial improvements or investments in establishing itself as an adult entertainment cabaret prior to adoption of the amended Code.  The New York State Court of Appeals has made clear that "'existing nonconforming uses will be permitted to continue, despite enactment of a prohibitory zoning ordinance, if, and only if, enforcement of the ordinance would by rendering valueless substantial improvements or businesses built up over the years, cause serious harm to the property owner.'" *Murphy v. Eastman*, 99 A.D.2d 885, 885, 472 N.Y.S.2d 787, 788 (3d Dep't 1984) (quoting *People v. Miller*, 304 N.Y. 105, 109, 106 N.E. 34, 34 (1952)).  In the case at bar, the removal of garments by dancers at plaintiff's cabaret on three nights obviously did not require substantial investment. Accordingly, we conclude that plaintiff has not established a pre-existing, non-conforming use as an adult entertainment cabaret.

## CONCLUSION

For all of the foregoing reasons, the motion of plaintiff Casanova Entertainment Group, Inc. for a preliminary injunction is denied. The motion to dismiss by defendant City of New Rochelle is denied.

SO ORDERED.

Dated: White Plains, New York
       June 29, 2005

_William C. Conner_
Sr. United States District Judge